UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
CIVIL ACTION NO. 1:12-CV-00098-JRW-HBB

SAAP ENERGY, INC., et al.                                      PLAINTIFFS

v.

RICKY E. BELL, et al.                                         DEFENDANTS

## **MEMORANDUM OPINION AND ORDER**

After eight years, over four hundred docket entries, and almost nine thousand pages in the record, the remaining defendants in this multi-million-dollar RICO and legal malpractice case are Danny Basil; I.A.T., Inc.; and John Prior, who all move for summary judgment.[1]

A. The Court **GRANTS**:

   1.      Prior's summary judgment motion (DN 329).

      o   The Court **DISMISSES** Plaintiffs' claims against Prior **with prejudice**.

   2.      Basil's motion to exclude Plaintiffs' expert witness Harry Callicotte (DN 324).

      o   The Court excludes Callicotte from testifying at trial.

B. The Court **GRANTS in part** and **DENIES in part**:

   3.      Basil's motion for summary judgment on Plaintiffs' other claims (DN 323).

      o   The Court **DISMISSES** Plaintiffs' fraud and fraud by omission claims against Basil **with prejudice**.

      o   The Court **DISMISSES** Saibabu Appalaneni's individual claims for lack of standing.

      o   Counts I, IV, and V against Basil may proceed to trial.

---

[1] Defendant Martin Kleinman passed away in 2016. DN 308. The Court substituted his estate and revived Plaintiffs' claims against him and his company, Falcon Energy, LLC. The Court's efforts to contact Falcon have been in vain. *See* DN 341.

4.      Plaintiffs' motion to exclude Basil's expert witness J. Duncan Pitchford and for partial summary judgment on their legal malpractice claim (DN 316).

- o   The Court excludes Pitchford from testifying at trial.

- o   The Court otherwise denies Plaintiffs' motion for partial summary judgment on their legal malpractice claim.

C.   The Court **DENIES**:

5.      Basil's motion to exclude Plaintiffs' expert Peter Ostermiller (DN 318).

6.      I.A.T., Inc.'s summary judgment motion (DN 319).

- o   Plaintiffs' claims against IAT may proceed to trial.

7.      Basil's motion for sanctions against Plaintiffs (DN 320).

8.      Basil's motion for partial summary judgment on Plaintiffs' legal malpractice claim (DN 321).

- o   Count X against Basil may proceed to trial.

9.      Basil's supplemental motion for summary judgment (DN 397).

D.   The Court **DENIES as moot**:

10.     Plaintiffs' motion to amend the consent judgment (DN 385).

E.   The Court **ORDERS**:

11.     Plaintiffs to file either a (a) notice saying that they intend to continue pursuing their claims against Yvette Kleinman (as personal representative of Martin Kleinman's estate) and Falcon Energy, LLC; or (b) proposed order dismissing those defendants with prejudice.

12.     The remaining parties to file a joint status report notifying the Court if (a) they would like another settlement conference before trial; or (b) their availability for trial.

The parties' deadline for these filings is **September 25, 2020**.

## I.  **Background**

"This lawsuit involves five (5) separate transactions consummated in the fall of 2011 through January 2012 for the sale of interests in oil wells located in south central Kentucky."  (DN 34 at #313).  After a complicated procedural history, we arrive at the latest in this ongoing saga. As an overview, Plaintiffs allege:[2]

In 2009, Martin Kleinman ("Martin")[3] incorporated Defendant Falcon Energy Group, Inc. to raise money from investors for drilling and reworking oil and gas wells.  (*Id.* ¶ 17).  Martin and Falcon Energy entered into a joint venture agreement with Ricky Bell ("Ricky") and Ricky's Rebell Oil businesses to raise money for Ricky and Rebell Oil's drilling and reworking operations. (*Id.* ¶ 18).  In July 2011, Martin met with two associates of Capital Business Solutions, Robert Caputo and Patrick Gagliardi, and agreed that Capital Business Solutions would create online solicitations to attract potential oil and gas lease and well investors.  (*Id.* ¶¶ 19-20).  After this meeting, Martin, Ricky, and Ricky's brother Max Bell ("Max") allegedly "began to compile false information" for Capital Business Solutions to use in its solicitations.  (*Id.* ¶ 21).

Plaintiff Saibabu Appalaneni first learned of the solicitations in September 2011.  (*Id.* ¶ 24).  This sparked conversations with Capital Business Solutions, Martin, Ricky, and Max about buying rights to oil leases.  (*Id.* ¶¶ 24-29).  Appalaneni was informed that Danny Basil, a lawyer, could help Appalaneni with certain legal matters related to the oil lease purchases.  (*Id.* ¶ 33).  Basil then assisted Appalaneni in creating Plaintiff SAAP Energy, Inc., the entity that would hold the purchased leases.  (*Id.* ¶ 34).

---

[2] Although Plaintiffs' Fourth Amended Complaint (DN 190) is the controlling complaint subsuming all previous complaints, Plaintiffs' First Amended Complaint (DN 34) is the main complaint setting forth Plaintiffs' allegations.  *See Hull v. Rawlings Co., LLC*, No. 3:18-CV-772-GNS, 2019 WL 1767893, at *2 (W.D. Ky. Apr. 22, 2019); *see generally* DNs 1, 34, 83, 123, & 190.

[3] Martin Kleinman passed away, and Yvette Kleinman represents his estate.  (DN 335).

The first purchases occurred in October 2011.  (*Id.* ¶ 39).  Appalaneni, on SAAP's behalf, met with Basil to close on three sets of leases.  (*Id.* ¶¶ 39, 40, 44, 62).  In November 2011, Plaintiffs closed on the North Edmonton lease assignments.  (DN 34 ¶ 72).  In January 2012, Plaintiffs closed on the Green County leases.  (*Id.* ¶¶ 77, 79; DN 123 ¶ 75).

Plaintiffs allege that Ricky, individually and through Rebell Oil, provided "bogus" profit and oil production information to attract buyers for the leases.  (DN 34 ¶ 16).  After the sales were complete, Ricky would increase profits by servicing the oil wells at "inflated costs, under the guise that the work would drastically improve production while transferring the environmental and permitting liabilities to the investors."  (*Id.*).  Plaintiffs allege that the defendants in this action were either a part of or benefitted from Ricky's scheme.  (*Id.*).  The defendants include Basil, Basil's company I.A.T., Inc., and John Prior, who bought one of the leases.  (*Id.*; DN 123 ¶ 12(a); DN 190 ¶ 12(b); DN 329-1 at #7229).

Plaintiffs asserted sixteen different counts against the several Defendants.  (DN 190 ¶¶ 242-256; DN 34 ¶¶ 82-241).

Following a settlement conference, the Magistrate Judge reported that Plaintiffs' claims against Ricky and Rebell Oil had been resolved, that the settling parties would submit a consent judgment, and that the remaining claims would continue.  (DN 374 at #8727).  The Court then approved a consent judgment, entitling Plaintiffs "to recover from the Defendants, Ricky E. Bell, Rebell Oil of KY, LLC, and Rebell Oil of KY, Inc., jointly and severally, a judgment" for $9,861,151.20 at 12% interest until satisfied.  (DN 378 ¶ 1).

Oral argument is unnecessary, and the Court is ready to rule on all outstanding motions.

## II.     Standard of Review

On summary judgment, the Court decides if there is any genuine issue of material fact and if the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  The moving party must identify evidence in the record that demonstrates the absence of a material factual dispute.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If the moving party satisfies its burden, the non-moving party must identify specific evidence in the record showing that a genuine factual dispute exists for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## III.    Basil's Supplemental Summary Judgment Motion and Plaintiffs' Motion to Amend the Consent Judgment

Basil essentially believes that the consent judgment (DN 378) ended this litigation.  (DN 397-1).  As explained below, Basil misinterprets the Court's consent judgment.

In May 2017, Plaintiffs filed a notice in which they estimated their damages as $9,861,151.20 but reserving "their right to modify claimed damages, as warranted by fact or as permitted by the Court."  (DN 373 at #8723).  Then, the Court entered the consent judgment that is the subject of Plaintiffs' motion to amend and Basil's supplemental motion for summary judgment.  The consent judgment states, in part:

> This cause is before the Court upon confession of judgment by the Defendant, Ricky E. Bell, individually, and as the sole member of Rebell Oil of KY, LLC and sole officer of Rebell Oil of Ky, Inc., made in open court following a settlement conference conducted on May 12, 2017, and further memorialized by the signatures of the parties herein.  The Court having considered the matter and otherwise being fully and sufficiently advised, it is HEREBY ORDERED AND ADJUDGED as follows:

> 1.     Plaintiffs are entitled to recover from the Defendants, Ricky E. Bell, Rebell Oil of KY, LLC, and Rebell Oil of KY, Inc., jointly and severally, a judgment in the amount . . . of $9,861,151.20, together with post-judgment interest at the legal rate of 12% per annum until satisfied.

> . . .

3.    The Defendant Ricky E. Bell agrees to cooperate in this matter, including appearing as a witness at any trial.

. . .

5.    The Court will retain jurisdiction over the enforcement of this consent judgment.

6.    There being no just cause [for] delay, Plaintiffs may have immediate execution on this judgment.

(DN 378).[4]  The judgment was signed only by Ricky, on behalf of himself and Rebell Oil.  (*Id.*).

Basil first argues that because the consent judgment awarded Plaintiffs all the damages they requested and established Ricky's and Rebell Oil's liability for those damages, there is nothing left in this litigation to adjudicate.  (DNs 397-1 & 399).   Basil conflates establishing liability against Bell with satisfying Plaintiffs' claims — including the claims against Basil. Simply because the consent judgment established Ricky's and Rebell Oil's liability and allowed Plaintiffs to recover nearly $10 million from Ricky and Rebell Oil does not mean that the consent judgment foreclosed Plaintiffs' claims against any non-party to the settlement.

To start, interpreting the consent judgment as allocating all fault to Ricky and Rebell Oil is inconsistent with the statement within the consent judgment that "Defendant Ricky E. Bell agrees to cooperate in this matter, including appearing as a witness at any trial."  (DN 378 ¶ 3).  If the consent judgment allocated all fault to only Ricky and Rebell Oil, then there would be no need for a trial and no need for Ricky's testimony.

Basil's interpretation also contradicts the Magistrate Judge's report which says, "The remaining claims in this case will continue for further adjudication."   (DN 374 at #8727).   If

---

[4] Plaintiffs' damages included a treble or punitive damages award of $6.3 million.  (DN 378).

resolving Plaintiffs' claims against Ricky and Rebell Oil resolved all claims, there wouldn't be any claims left to adjudicate.

Finally, if Ricky and Rebell Oil were the only ones at fault in this case, an order dismissing all of Plaintiffs' claims against all other defendants in this case would have followed the consent judgment, which didn't happen.

In sum, the consent judgment conclusively established only Ricky and Rebell Oil's liability for Plaintiffs' damages, but it did not preclude a finding of liability against the remaining defendants in this case.

Basil's second argument is similarly unavailing.  Basil contends that because Plaintiffs have received a judgment awarding them all the damages they requested, any judgment against any other defendant would result in an impermissible double recovery.  (DNs 397-1 & 399).  This argument, however, mistakenly assumes that the same monetary award against two sets of defendants automatically results in an impermissible double recovery.

A double recovery won't happen for two reasons.  First, Plaintiffs will only be able to recover damages from Ricky and Rebell Oil and the other defendants according to their apportioned fault.  *See Degener v. Hall Contracting Corp.*, 27 S.W.3d 775, 779 (Ky. 2000) ("liability among joint tortfeasors . . . is no longer joint and several, but is several only").

Second, both Kentucky and federal law preclude a double recovery.  *Stratton v. Parker*, 793 S.W.2d 817, 821 (Ky. 1990); *UTHE Tech. Corp. v. Aetrium, Inc.*, 808 F.3d 755, 759-60 (9th Cir. 2015) ("one satisfaction rule" applies to RICO claims).  Thus, if Plaintiffs receive damages from Ricky and Rebell Oil, those amounts would be credited to the other defendants, preventing a double recovery.

Finally, although Basil argues that any further punitive damages recovery is unconstitutional, addressing this argument is premature because Plaintiffs have not received any other punitive damages award.

For these reasons, denying Basil's supplemental motion for summary judgment is appropriate, as is denying as moot Plaintiffs' motion to amend the consent judgment.

### IV.   Basil's Motion for Partial Summary Judgment on Counts, I, II, III, IV, and V; Basil's Motion for Partial Summary Judgment on Count X; Plaintiffs' Motion for <u>Partial Summary Judgment on Count X; and Expert Witness Challenges</u>

Basil moves for summary judgment against Plaintiffs on Counts I, II, III, IV, V, and X of the Complaint.  (DNs 321 & 323).  Plaintiffs admit they cannot maintain a fraud claim (Count II) against Basil.  (DN 346).  Dismissing that claim with prejudice is appropriate.

Plaintiffs' claims against Basil are:

- civil conspiracy (Count I);

- fraud by omission (Count III);

- a civil RICO claim under 18 U.S.C. § 1962(c) (Count IV);

- a RICO conspiracy claim (Count V); and

- legal malpractice (Count X).

(DN 34 ¶¶ 82-84, 95-131, 203-14).  Basil also contends that Appalaneni does not have individual standing in this case.  (DN 323-1).

### A.  Appalaneni's Standing to Assert Claims Against Basil

Basil argues that Appalaneni does not have standing to assert claims in this case.  (DN 323-1 at #8685-6).  Generally, a corporation's owner lacks standing to recover for the corporation's losses.  *See Canderm Pharmacal, Ltd. V. Elder Pharmaceuticals, Inc.*, 862 F.2d 597, 603 (quoting *Schaffer v. Universal Rundle Corp.*, 397 F.2d 893, 896-7 (5th Cir. 1968)).  Appalaneni unequivocally testified that he has no personal interest separate and apart from SAAP's interest in

the outcome of this case.  (DN 323-2 at #6297).  Given Appalaneni's testimony that he hasn't personally suffered any harm, he lacks standing for his individual claims.  Dismissing his individual claims with prejudice is appropriate.

### B.  Count X – Legal Malpractice

The bulk of SAAP and Basil's motions concern SAAP's legal malpractice claim against Basil.  (DNs 316, 318, & 321).  The Court will discuss the expert witness challenges first.

#### 1.  Plaintiffs' expert Peter Ostermiller

Ostermiller teaches legal ethics seminars and has previously testified as a legal ethics expert witness.  (DN 318-2 at #3969).  Ostermiller's specialization in legal ethics and the Kentucky Rules of Professional Conduct make him well suited to say whether Basil's conduct as an attorney fell below the standard of care, especially when a violation of those rules "may be evidence of breach of the applicable standard of conduct."  SCR 3.130(XXI).

Among Basil's other alleged ethical issues, Ostermiller says Basil had a conflict of interest in representing Ricky and Plaintiffs at the "same period of time."  (DN 318-2 at #3974). Ostermiller properly relies on the testimony of the key players.  Additionally, Ostermiller's knowledge of the legal ethics rules that bound Basil will assist the jury in determining whether Basil's conduct fell below the standard of care when he represented Plaintiffs.  Of course, whether Basil breached his duty to the Plaintiffs is for the jury to decide.

Basil says Ostermiller doesn't have specific knowledge about how these legal ethics rules work in the oil and gas leasing business.  (*See* DN 318-1 at #8630-8).  If both legal ethics expertise and industry expertise were necessary, Plaintiffs would be hard-pressed to find a lawyer specializing in both legal ethics in Kentucky and oil and gas lease transactions in Kentucky. Regardless, Basil doesn't explain how the ethical analysis differs in the oil and gas leasing context

compared to traditional transactional matters, nor do the Rules of Professional Conduct suggest otherwise.  Ostermiller's knowledge of and experience in legal ethics render him qualified to opine that Basil's conduct fell below what is expected of reasonable lawyers.

Basil next faults Ostermiller for not reviewing testimony from Martin, Max, Ricky, and others.  (DN 318-1 at #8638-42).  Yet, Basil doesn't explain why Ostermiller's alleged failure to review other testimony undercuts his testimony about what duties Basil owed Plaintiffs.  Nor does he explain why Ostermiller's reliance on Basil's and Appalaneni's testimony — the people whose attorney-client relationship is at the center of this lawsuit — renders his opinions on what that relationship should have been inadmissible.  (*See* DN 318-1 at #8643-5).  Instead, Basil resorts to cherry-picking and distorting Ostermiller's testimony.  (*See, e.g.,* DN 318-1 at #8645).

In sum, Ostermiller's testimony may assist the jury in evaluating whether Basil breached his duties when he represented Plaintiffs.  He is qualified to render helpful and reliable opinions.

### 2.  **J. Duncan Pitchford and Harry Callicotte**

To rebut Ostermiller, Basil offers proposed expert witness J. Duncan Pitchford.  (DN 344-2).  Basil bears the burden of showing that Pitchford's proposed testimony is reliable.  *Nelson v. Tennessee Gas Pipeline Company*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 n.10 (1993).  Pitchford takes issue with Ostermiller's reliance on the Rules of Professional Conduct and his conclusion that Basil's representation fell below the standard of care, but he doesn't cite any case law supporting his apparent belief that a lawyer's sole job is to do what the client asks the lawyer to do.  (*See, e.g.*, DN 344-2 at #7643 ("Mr. Basil completed the tasks which were requested of him by the Plaintiffs prior to and at the closing.")).

The absence of any case law from Pitchford's report is glaring. "An attorney cannot completely disregard matters coming to his attention which should reasonably put him on notice that his client may have legal problems or remedies that are not precisely or totally within the scope of the task being performed by the attorney." *Daugherty v. Runner*, 581 S.W.2d 12, 16 (Ky. App. 1978) (citing *Owen v. Neely*, 471 S.W.2d 705 (Ky. 1971)). And in contrast to Pitchford, Ostermiller cites case law. (*See, e.g.*, DN 318-2 at #3972-3).

Pitchford dismisses the Kentucky Rules of Professional Conduct as "guidance." (DN 344-2 at #7645). The rules do say that they are "designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies." SCR 3.130(XXI). But the rules also "establish standards of conduct by lawyers, [and] a violation of a Rule may be evidence of breach of the applicable standard of conduct." *Id.* And "the text of each Rule is authoritative." SCR 3.130(I). Ultimately, "[e]very lawyer is responsible for observance of the Rules of Professional Conduct." SCR 3.130(XIII).

In all, Basil has not met his burden of showing that Pitchford's testimony is reliable. And because Plaintiffs offer Harry Callicotte only to rebut Pitchford's testimony, Callicotte's testimony is unnecessary. (*See* DN 347 at #8193).

### 3. **Motions for Summary Judgment on Legal Malpractice Claim**

"A plaintiff in a legal malpractice case has the burden of proving 1) that there was an employment relationship with the defendant/attorney; 2) that the attorney neglected his duty to exercise the ordinary care of a reasonably competent attorney acting in the same or similar circumstances; and 3) that the attorney's negligence was the proximate cause of damage to the client." *Marrs v. Kelly*, 95 S.W.3d 856, 860 (Ky. 2003) (cleaned up). Basil admits that he was

the Plaintiffs' lawyer.  (DN 318-5 at #4452).  The question is whether Plaintiffs can establish the breach, causation, and damages elements.

SAAP not only believes it can survive Basil's summary judgment motion on the breach element — SAAP believes it has conclusively established breach as a matter of law.  (DN 316 at #3772-3).  Usually, both breach and injury are fact questions for the jury.  *Patton v. Bickford*, 529 S.W.3d 717, 729 (Ky. 2016) (citing *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 89 (Ky. 2003)).  SAAP cites no law for the proposition that an attorney's violation of the Rules of Professional Conduct *automatically* establishes breach as a matter of law.

To the contrary, the Rules of Professional Conduct say otherwise.  "Violation of a Rule should not itself give rise to a cause of action against a lawyer nor should it create any presumption in such a case that a legal duty has been breached."  SCR 3.130(XXI).  And the Rules of Professional Conduct "are not designed to be a basis for civil liability."  (*Id.*).

Accordingly, the Court declines to hold that Basil's apparent violation of the Rules of Professional Conduct establishes the breach element, and SAAP isn't entitled to summary judgment on this point.

But that doesn't mean that Basil has shown he is entitled to summary judgment on the breach element either.  Basil relies on his argument that Ostermiller should be excluded.  (*See* DN 321-1 at #8663-65).  Given that Ostermiller's testimony is admissible, it follows that Basil isn't entitled to summary judgment on the breach element.  To the contrary, Plaintiffs have presented plenty of evidence of Basil's breach.

As for causation, it is undisputed that Basil never took any steps to remedy his potential conflict of interest.  Basil's conflict of interest arguably prevented him from advising Plaintiffs to take certain steps to make sure their purchases of the subject leases were prudent.  Specifically,

Basil's alleged conflict of interest prevented him from disclosing to Plaintiffs they were buying the Taylor lease for more than twice what Ricky had paid for it.  Further, Appalaneni was ready to back out of the Stinson lease deal before Basil stepped in and assured Appalaneni that SAAP could obtain full ownership of the lease.  Moreover, had Basil disclosed the truth about his relationship with Ricky, Plaintiffs may have hired a new lawyer who would serve their interests.

As for damages, even if SAAP sold these leases at the values represented by Basil, SAAP has still suffered approximately $13,936.76 in capital improvement and incidental damages relating to those three leases, plus overall operating expenses of $246,190.11.  (DN 347-5 at #8265).  SAAP would not have incurred these costs had Basil not lured them into these deals in the first place.  SAAP has sufficiently shown it has suffered damages to survive Basil's motion for summary judgment on SAAP's legal malpractice claim against him.

Plaintiffs have presented plenty of evidence on the elements of a legal malpractice claim. Basil isn't entitled to summary judgment on that claim.

## C.  Counts IV – RICO 18 U.S.C. § 1962(c) Claim & Count V – RICO Conspiracy Claim

A Section 1962(c) claim "requires conduct of an enterprise through a pattern of racketeering activity."  *Heinrich v. Waiting Angels Adoptions Services, Inc.*, 668 F.3d 393, 404 (6th Cir. 2012) (cleaned up).

### 1.  Conduct

To establish the conduct element, Plaintiffs must show that Basil participated in the enterprise's operation or management.  *See Reves v. Ernst & Young*, 507 U.S. 170, 184 (1993) ("In this case it is clear that Congress did not intend to extend RICO liability under § 1962(c) beyond those who participate in the operation or management of an enterprise through a pattern of racketeering activity.").

Basil says he only provided traditional legal services, which cannot form the basis for a RICO violation.  (DN 323-1 at #8699-8704).  It's "unremarkable" that a lawyer who provides more than traditional legal services can be liable on a RICO claim.  *Handeen v. Lemaire*, 112 F.3d 1339, 1349 (8th Cir. 1997).  And here, the record is replete with evidence that Basil's actions went beyond traditional legal services.  For example, and detailed previously, Basil represented both the buyer and the seller in these transactions.  *See* SCR 3.130 Comment (7) ("Directly adverse conflicts can also arise in transactional matters.").

Viewing this evidence in SAAP's favor, there is a genuine factual issue on the conduct element.

## 2.  Enterprise

A RICO enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  A RICO enterprise is "obviously broad, encompassing *any* group of individuals associated in fact."  *Boyle v. United States*, 556 U.S. 938, 944 (2009) (cleaned up).  A plaintiff proves an enterprise "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.'"  *Id*. at 945.

The enterprise's structure "must have . . . a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  *Id*. at 946.  But "this organizational structure need not be hierarchical, can make decisions on an ad hoc basis, and does not require the members to have fixed roles."  *Ouwinga v. Benistar 419 Plan Services, Inc.*, 694 F.3d 783, 794 (6th Cir. 2012).  Finally, "although the existence of an enterprise is a separate element that must be proved, the evidence used to prove

the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.'" *Id.* (quoting *Boyle*, 556 U.S. at 947).

In this enterprise, brokers were told to affirmatively represent:  "ALL TITLES ARE READY AND CLEARED BY OUR ATTORNEY AND THE DRILLER IS READY TO DRILL ADDITIONAL WELLS AS YOU REQUEST EXPANSION[.]  ALL CLOSINGS ARE DONE AT DAN BASIL, ESQ IN GLASCOW[,] KY.  YOU RECEIVE CLEAR TITLE AT ONCE UPON CLEARED FUNDS[.]"  (DN 346-3).  This instruction outlines the enterprise and roles of each party.  The goal was to sell oil leases with Capital Business Solutions soliciting business, Basil closing the oil lease sales, and Ricky and Rebell Oil managing the oil wells.

Although Basil says that he never gave Martin and Capital Business Solutions permission to use his name in these solicitations, that's a genuine fact issue for the jury to resolve.  Martin testified that Ricky gave him permission to use Basil's name, which supports the inference that Basil allowed Ricky to represent to potential oil lease purchasers that Basil could assist with closings.  (DN 215-5 at #2245).

Although Basil claims that he was "out of the loop" on the lease transactions and only played a limited role in effectuating them, the evidence suggests otherwise.  (DN 323-1 at #8706).  When Appalaneni expressed interest in hiring an attorney and CPA to assist with the lease purchases, Ricky told him, "it's [a] simple process.  Usually I do . . . these lease transfers by myself.  Since you are outsiders we could recommend [an] attorney who can help both of us."  (DN 323-2 at #6378).  Additionally, before the first closing, Martin assured Appalaneni and Appalaneni's associate that "[Basil] basically is working for both of us, and he will take care of everything, and he said this is a simple process, and it usually happens in front of the courthouse near by the steps, but [Basil] will take care of it."  (DN 346-5 at #8036).

15

In sum, SAAP has presented sufficient evidence to establish an enterprise.

### 3.  Pattern of Racketeering Activity

Finally, a "pattern of racketeering activity" is "at least two acts of racketeering activity" in the last 10 years.  18 U.S.C. § 1961(5).  The plaintiff must show "that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity."  *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989).

SAAP says it satisfies the open-ended continuity test.  (Pls.' Resp. Def.'s Mot. Partial Summ. J. 35-37).  To establish RICO liability predicated on open-ended continuity:

> [L]iability depends on whether the *threat* of continuity is demonstrated.  So the plaintiffs must plausibly allege that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed. Determining whether the predicate acts establish open-ended continuity requires a court to examine the specific facts of the case.  The threat of continuing racketeering activity need not be established, however, exclusively by reference to the predicate acts alone; rather, a court should consider the totality of the circumstances surrounding the commission of those acts.

*Heinrich v. Waiting Angels Adoption Services, Inc.*, 668 F.3d 393, 410 (6th Cir. 2012) (cleaned up).

Basil says he "told Ricky that he needed to get somebody else to take care of these things. I didn't want to be involved any further."  (DN 318-5 at #4421).  Although Basil may have withdrawn from any further participation in the SAAP-Ricky transactions, it is unclear what Basil meant when he told Ricky this.  In other words, was Basil withdrawing only from the deals between Ricky and SAAP?  Or was he withdrawing from all of Ricky's deals?  Viewing this evidence in SAAP's favor, the extent of Basil's withdrawal from the Capital Business Solutions and Ricky's oil lease selling enterprise is unclear.

Basil also says he retired from practicing law.  (DN 318-5 at #4421).  SAAP points to CourtNet records showing Basil as the attorney of record in cases filed after he allegedly withdrew

from the SAAP-Ricky deals.  (DN 346-9).  Although Basil argues that CourtNet records are not properly admissible as evidence, he admits that he appeared as counsel of record in cases after his purported retirement.  (DN 365 at #8584).  Because Basil continued to practice law, there is a genuine issue of material fact for whether Basil continued to facilitate oil lease sales between Ricky and potential buyers.  Moreover, even assuming that Basil did actually retire, his retirement didn't preclude him from participating in Ricky's deals as another salesperson, a role he had eagerly played.

Because the Plaintiffs have presented genuine fact issues for trial on the RICO claim, Basil isn't entitled to summary judgment, and that claim may proceed to trial.

Relatedly, Basil argues that because Plaintiffs' Section 1962(c) claim and civil conspiracy claims fail, their RICO conspiracy claim (Count V) also fails.  (*See* DN 323-1 at #8713-4).  Having concluded elsewhere that Plaintiffs' RICO claim and civil conspiracy claim may go forward, Count V may also proceed.

### D.  Count I – State Law Claim for Civil Conspiracy

For their civil conspiracy claim, Plaintiffs "must show an unlawful/corrupt combination or agreement between the alleged conspirators to do by some concerted action an unlawful act." *Peoples Bank of Northern Kentucky, Inc. v. Crowe Chizek and Company LLC*, 277 S.W.3d 255, 261 (Ky. Ct. App. 2008).  Plaintiffs may prove that Basil acted in concert with the other defendants if Basil committed a tortious act pursuant to a common design with the other defendants.  *See id.* (cleaned up).  As explained elsewhere, Plaintiffs' claim against Basil for legal malpractice, which is a tort, may proceed to trial.  Plaintiffs could prove that claim at trial by establishing that Basil's conflict of interest — which they say he ignored as he pursued a common design with his alleged

co-conspirator, Ricky — ties him directly to Ricky.  Accordingly, Plaintiffs' state-law civil conspiracy claim may proceed to trial against Basil.

### E.  Count III – Fraud by Omission

Having concluded that Plaintiffs' legal malpractice claim against Basil may proceed, the Court will dismiss their fraud by omission claim because it's the same as their legal malpractice claim.  *See Wilkey v. Hull*, 598 F.Supp.2d 823, 830 (S.D. Ohio 2009) (when the same acts give rise to both fraud and legal malpractice claims, under Ohio law, "[c]lothing a malpractice action in the language of fraud does not convert the action into one based on fraud").

### F.  <u>Basil's Motion for Sanctions</u>

In a final attempt to avoid a jury, Basil moves for sanctions against SAAP for Appalaneni and SAAP's shareholders' purported spoliation of evidence.  (DN 320-1).  Basil's motion stems from his alleged inability to obtain emails from Appalaneni and SAAP's shareholders that he believes are relevant to this case through Appalaneni and the shareholders' deletion of or otherwise failure to preserve those emails.  (DN 320-1 at #4514).

In determining whether to impose sanctions for failing to preserve electronically stored information, Rule 37(e) governs.[5]  In relevant part, Rule 37 provides:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation <u>*may*</u>:

---

[5] At first, Basil incorrectly sought to apply the standards of the pre-2015 amended version of Rule 37(e). (DN 320-1 at #4523-32).  Basil faulted Plaintiffs for this. (*See* DN 363 at #8540 n.2).  But then, he conceded that applying the amended Rule 37(e) would not be unjust or impracticable: "[T]he 2015 amendments application does not affect the conclusion that spoliation sanctions are warranted here." (*Id.*).

(A)    presume that the lost information was unfavorable to the party;

(B)    instruct the jury that it may or must presume the information was unfavorable to the party; or

(C)    dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e) (emphasis added).

Basil has not shown — or even said — that the emails were "lost" and "cannot be restored or replaced through additional discovery." *See* Rule 37(e) advisory committee comment ("the initial focus should be on whether the lost information can be restored or replaced through additional discovery."). But even if he had met the rule's first prong, he also hasn't shown prejudice from not having the emails, nor has he shown that Appalaneni intentionally deprived him of the emails.

Putting all that aside, even if Basil satisfied the rule, he hasn't shown that the Court should use its discretion to impose the harsh sanctions the rule envisions. "The remedy should fit the wrong." Rule 37(e) advisory committee comment. His motion reeks of gamesmanship. He brought it after the May 5, 2016 discovery deadline passed. With that context in mind, the Court will exercise its discretion under Rule 37 and decline to impose any sanctions on Plaintiffs.

## V.    <u>I.A.T.'s Motion for Summary Judgment</u>

I.A.T. moves for summary judgment against Plaintiffs on their civil conspiracy claim. (DN 317).

Although civil conspiracy is predicated on an underlying wrong, I.A.T. does not have to commit an underlying tort to commit civil conspiracy; in other words, Plaintiffs do not have to assert that I.A.T. is liable for fraud for I.A.T. to be liable for civil conspiracy. Instead, Plaintiffs must show that I.A.T. did "a tortious act in concert with the other or pursuant to a common design with him." *Peoples Bank of Northern Kentucky, Inc. v. Crowe Chizek and Co. LLC*, 277 S.W.3d

255, 261 (Ky. Ct. App. 2008).  As Ricky has admitted to liability in this case, Plaintiffs need only satisfy the concert of action prong to maintain their civil conspiracy claim against I.A.T.

"It is well settled that a corporation . . . can only act through its agents."  *BancInsure, Inc. v. U.K. Bancorporation Inc./United Kentucky Bank of Pendleton County, Inc.*, 830 F.Supp.2d, 294, 301 (E.D.Ky. 2011).  In agency law, "a principal is charged with notice of facts that an agent knows or has reason to know."  *Id.* at 302.  In other words, what Basil knew about Ricky's transactions is imputed to I.A.T.  On that point, a genuine issue of material fact exists for whether Basil knew about the fraudulent nature of Ricky's transactions.  Because Basil was intimately involved in Ricky's transactions, he likely knew about the fraudulent nature of these transactions.

Additionally, I.A.T. benefitted from these transactions.  Basil received a $10,000 check for I.A.T.'s interest in the Waters lease.  (DN 318-5 at #4383).  Although the $10,000 check was made out to Basil individually, I.A.T. does not dispute that Basil was acting on I.A.T's behalf when he accepted the money, since those proceeds were given in exchange for I.A.T.'s interest in the Waters lease.  (DN 317-1 ¶¶ 7, 9).

Because Plaintiffs have shown that a genuine issue of material fact exists on the concert of action part of their civil conspiracy claim, I.A.T. isn't entitled to summary judgment.

### VI.    Prior's Motion for Summary Judgment

Prior moves for summary judgment on the sole contention Plaintiffs assert against him — that the Court should equitably force Prior to turn over $30,000 in proceeds that he received from the sale of his working interest in the Green County leases, which Plaintiffs subsequently purchased.  (DN 190 ¶¶ 242-56).

"A constructive trust arises when a person entitled to property is under the equitable duty to convey it to another because he would be unjustly enriched if he were permitted to retain it."

*Patel v. Tuttle Props., LLC*, 392 S.W.3d 384, 387-88 (Ky. 2013) (cleaned up) (quoting *Terrill v. Estate of Terill*, 217 S.W.3d 858, 860 (Ky. App. 2006)).

Notably, "[i]t is true, despite cases to the contrary . . . that Kentucky courts have required the party seeking the imposition of a trust to establish a 'confidential relationship' with the party upon whom the trust is to be imposed." *Keeney v. Keeney*, 223 S.W.3d 843, 849 (Ky. App. 2007) (quoting *Panke v. Panke*, 252 S.W.2d 909, 911 (Ky. 1952)).  On this basis alone, Plaintiffs' claims against Prior lack merit.  Plaintiffs don't assert that a confidential relationship existed between themselves and Prior.  And even if a confidential relationship isn't required, Plaintiffs don't allege anything close to "similar means or circumstances rendering it unconscionable" for Prior to retain the $30,000.  *New York Life Insurance Co. v. Terry*, 2017 WL 102965 *14 (quoting *Kenney*, 223 S.W.3d at 849).  Accordingly, Prior is entitled to summary judgment.

Justin R Walker, District Judge
United States District Court

August 26, 2020

21